IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**NAQEEB CAHACCI**,
4300 Kelly Drive
Apt 512
Philadelphia, PA 19129
*A Resident of Philadelphia County, PA*

Plaintiff; Docket No.: 2:26-cv-8545

vs.

**SEPTA,**
1234 Market Street
Floor 7
Philadelphia, PA 19107
*An Agency and Instrumentality of the Commonwealth of Pennsylvania,*

**COMPLAINT IN CIVIL ACTION**

Defendant.

Filed on behalf of Plaintiff:
NAQEEB CAHACCI

Counsel of Record for this Party:
Law Office of Steven T. Auerbach
201 Meetinghouse Lane
Merion Station, PA 19066
**Steven Auerbach, Esquire, LL.M.**
Ph: (215) 964-4410
Fax: (215) 613-0890
Auerbach.Steven@gmail.com
Pa. I.D. #317309
**Ruslan Aminov, Esquire**
Ph: (267) 905-9990
Fax: (215) 613-0890
Ruslan.Aminov@TheAuerbachFirm.com
Pa. I.D. #340505

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NAQEEB CAHACCI, Plaintiff; | ) | |
| | ) | No.: 2:26-cv-8545 |
| vs. | ) | |
| | ) | |
| SEPTA, Defendants. | ) | |

## I. EMPLOYMENT DISABILITY DISCRIMINATION COMPLAINT

Plaintiff, Naqeeb Cahacci ("Mr. Cahacci" or "Plaintiff"), by and through his undersigned counsel, the Law Office of Steven T. Auerbach, hereby files this Employment Disability Discrimination Complaint against Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Defendant")(collectively, the "Parties") seeking declaratory and equitable relief; economic, and compensatory; and attorneys' fees and costs to redress Defendant's violations of civil rights as secured by Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (the "Rehabilitation Act") and by Title I of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. (the "ADA"), and in support thereof, avers the following:

## II. INTRODUCTION

### a. Disability Discrimination, Failure to Accommodate, and Hostile Work Environment

1. Employers should not respond to an employee's disability-related needs with ridicule, punishment, or disregard for the employee's health. An employer that knows that an employee requires frequent restroom access should not force him to choose between requesting a medically necessary break and exposing himself to further ridicule, or permit coworkers to turn his symptoms into a source of public humiliation.

2. An otherwise qualified employee should be able to request a reasonable accommodation without fear that his request—or his medical condition—will be used against him.

3. The Rehabilitation Act and the ADA protect against precisely this kind of mistreatment. They require employers to address an employee's disability-related needs through reasonable accommodation, rather than allow those needs to become grounds for humiliation or punishment. These protections are particularly important when a medical condition affects a private bodily function and fear of ridicule may discourage an employee from requesting the assistance he needs.

4. Plaintiff's claims concern a basic medical need: timely access to a restroom because of a documented prostate condition.

5. Despite receiving medical documentation and repeated notice of Plaintiff's condition, Defendant's personnel repeatedly denied or delayed his restroom access. Coworkers then mocked his urinary symptoms and physical discomfort, calling him "the pee pee boy," comparing him to babies who require diapers, and ridiculing the way he moved.

6. The mistreatment escalated when an assistant director physically blocked Plaintiff's attempt to reach a restroom and ordered him to complete a report instead. Plaintiff was forced to continue holding his urine and lost bladder control before reaching a restroom.

7. Plaintiff reported the confrontation and hostile working conditions to senior management. Defendant nevertheless failed to take effective corrective action or provide an accommodation that addressed his recurring need for timely restroom access.

8. The repeated denial of medically necessary restroom access, disability-related humiliation, and lack of effective corrective action ultimately created working conditions that Plaintiff alleges compelled him to resign.

## III. PARTIES

9. Defendant SEPTA is a public transportation authority organized under the laws of Pennsylvania that employs approximately 9,500 individuals.[1]

10. As a recipient of federal funds, SEPTA is subject to the terms of the Rehabilitation Act. *Smith v. SEPTA*, PICS No. 84-4942 (E.D. Pa. 1987).

11. Plaintiff Mr. Cahacci is an adult citizen of the United States and is a resident of Philadelphia, Pennsylvania.

12. At all times relevant hereto, Mr. Cahacci suffers from a chronic prostate condition that substantially limits urinary and bladder functions.

13. From approximately December 2, 2024, through October 26, 2025 (the "Term of Employment"), Plaintiff worked for SEPTA as a full-time Control Center Manager in its Subway/Elevated department.

14. At all times relevant to this action, Plaintiff was an "employee" of Defendant within the meaning of the Rehabilitation Act and the ADA.

15. At all times relevant to this action, Defendant was Plaintiff's "employer" within the meaning of the Rehabilitation Act and the ADA.

16. At all times relevant herein, Defendant acted by and through its agents, supervisors, and employees in connection with the employment practices described in this Complaint.

17. Defendant caused and/or failed to prevent or correct the violations set forth in this Complaint.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

18. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

---

[1] https://wwww.septa.org/about/leadership/ (last visited 11/5/26)

19. Plaintiff has fully complied with all administrative prerequisites for the commencement of this action.

**a. Plaintiff's Allegations are Timely-Administratively-Filed**

20. On August 3, 2026, Plaintiff filed a timely charge of continuous employment discrimination and retaliation with the the United States Equal Employment Opportunity Commission ("EEOC").

21. In assessing the timeliness of an administrative filing, the Supreme Court has differentiated between "discrete acts" and "hostile work environments." For discrete acts, which are "easy to identify" and include "termination, failure to promote, denial of transfer, or refusal to hire," parties must file charges within the statutory timelines or "lose the ability to recover for it." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002).

22. Under the ADA, a charge complaining of a discrete act must be administratively filed within 300 days in order to be considered timely filed.

23 Plaintiff's below-described constructive discharge, a discrete act, falls within two-hundred eighty-one (281) days of his administrative filing.

**b. Plaintiff's Allegations May Be Aggregated as Continuing Violations**

24. Hostile work environments, by contrast, are made up of separate acts; even if the acts are not actionable in their own right, they may collectively comprise a discriminatory employment practice. *Nat'l R.R. Passenger Corp.* at 115-117. Because a hostile work environment "cannot be said to occur on any particular day," plaintiffs may recover for acts that predate the statutory period if the acts are part of a "continuing violation." *Id.*

25. To invoke the continuing violation doctrine, a plaintiff "must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act

falls within the applicable limitations period. *Mandel v. M&Q Packaging Corp*, 706 F.3d 157, 165-166 (3d. Cir. 2013).

26. The Third Circuit has directed district courts to consider "subject matter" (whether the violations constitute the same type of discrimination) and "frequency" (whether the conduct involved similar conduct by the same individuals, suggesting a persistent, ongoing pattern) when distinguishing continuing violations from isolated incidents. *Id*. at 166.

27. As described more-fully below, Plaintiff has clearly satisfied the "subject matter" and "frequency" requirements.

28. The conduct that he describes as a "hostile environment" includes repeated recurring ridicule of his urinary symptoms and physical limitations, repeated interference with medically necessary restroom access, and supervisory intimidation concerning his efforts to obtain that access which only ended on October 25, 2026 (two-hundred eighty-one (281) days of his administrative filing)).

c. **Plaintiff Has Timely Filed This Action**

29. Plaintiff received his "Right to Sue" notice from the EEOC on August 11, 2026.

30. Plaintiff commenced the initial, unamended action within ninety (90) days of receipt of this notice.

## V. JURISDICTION AND VENUE

31. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the laws of the United States and seeks redress for violations of federally protected civil rights.

32. This action is authorized by 29 U.S.C. § 794a and 42 U.S.C. § 12117.

33. This Court may properly exercise personal jurisdiction over Defendant because Defendant operates, employs personnel, and engaged in the challenged employment practices within Pennsylvania and this judicial district.

34. Venue is appropriate under 42 U.S.C. § 2000e-5(f)(3), as incorporated by 42 U.S.C. § 12117(a), and 28 U.S.C. § 1391 because the challenged employment practices and a substantial part of the events giving rise to this action occurred within the Eastern District of Pennsylvania.

## VI. FACTUAL ALLEGATIONS

35. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

### a. Plaintiff's Qualifications and Employment

36. Before joining Defendant, Plaintiff accumulated more than six (6) years of railroad and bus operations experience with NJ Transit and the Metropolitan Transportation Authority's Long Island Rail Road.

37. Plaintiff's prior experience included work as a supervisor of train movement, bus operator, and assistant conductor.

38. Plaintiff holds a bachelor's degree in mathematics, a master's degree in engineering, and a doctorate in engineering.

39. Plaintiff possessed the education, experience, and skills required for his position and could perform its essential functions with reasonable accommodation.

40. During the relevant period, Rayshawn Johnson Sr. served as Senior Director of the Control Center's Subway/Elevated operations, and David Lucas Sr. served as an assistant director with supervisory authority over Plaintiff.

**b. Plaintiff's Disability and Defendant's Knowledge Thereof**

41. Plaintiff has a chronic enlarged-prostate condition that substantially limits urinary and bladder functions.

42. His condition requires more frequent and urgent restroom access than is ordinarily required by a person without the condition.

43. Delayed restroom access causes Plaintiff significant physical discomfort and may result in urinary leakage or loss of bladder control.

44. Beginning at the start of the Term of Employment and continuing thereafter, Plaintiff supplied Defendant's supervisors with medical documentation concerning his condition.

45. Plaintiff also personally informed supervisors and training personnel of his condition and his need for timely restroom access.

46. Plaintiff requested accommodation through that documentation, discussions with management, and specific requests to use a restroom when medically necessary.

47. Reasonable accommodations included permitting timely restroom breaks and arranging temporary relief or coverage when necessary for his operational assignment.

48. Plaintiff did not request that Defendant disregard essential safety responsibilities or permit an operational position to remain unattended without appropriate arrangements.

**c. Defendant's Repeated Denials of Restroom Access**

49. In approximately December 2024, Plaintiff participated in Market-Frankford Line training that required him to walk an elevated catwalk for more than nine blocks in cold winter conditions.

50. Plaintiff requested a restroom break because of his prostate condition, but training personnel refused, requiring him to continue despite substantial discomfort.

51. On or about May 19, 2025, a supervisor again denied Plaintiff permission to use a restroom despite Defendant's knowledge of his condition.

52. In March 2025, a supervisor again denied Plaintiff permission to use a restroom despite Defendant's knowledge of his condition.

53. In approximately June 2025, Plaintiff participated in Broad Street Line training associated with the Fern Rock Yard.

54. During a walking exercise through the subway system in extreme heat, Plaintiff informed instructor Greg Tobias that he urgently needed to use a restroom because of his condition. Tobias denied immediate access and required Plaintiff to continue walking for an extended period. Before Plaintiff reached a restroom, he leaked urine and wet his pants.

55. When Plaintiff was finally permitted to proceed toward a restroom, Tobias loudly and aggressively directed him to "hurry up."

56. Throughout the Term of Employment, supervisors also required Plaintiff to remain after his scheduled shift to complete operational reports while delaying his access to a restroom.

**d. Coworkers Publicly Mocked Plaintiff's Disability and Physical Limitations**

57. Following the December 2024 training incident, coworkers repeatedly called Plaintiff "the pee pee boy."

58. During the summer of 2025, train dispatcher and coworker Lawyer Taylor repeatedly mocked Plaintiff's urinary symptoms in the shared operational workspace.

59. On multiple occasions, Taylor stated, "I only know two people who need to wear a pamper like Naqeeb: astronauts and babies."

60. Coworker Tyrone Medley laughed at Taylor's remarks, contributing to Plaintiff's public humiliation.

61. Taylor and coworker Saiedah Miller also repeatedly mocked Plaintiff's physical pace, telling him that he "moves like an old man" and is "so slow."

62. These remarks targeted Plaintiff's movements while he experienced physical discomfort associated with his prostate condition and delayed restroom access.

63. The remarks were part of the disability-based ridicule directed at Plaintiff's symptoms and associated physical limitations.

64. Coworkers also stood behind Plaintiff while he transmitted operational instructions over the transit radio, making loud noises and laughing.

65. That conduct interfered with his communications and intensified the anxiety accompanying his urinary symptoms.

66. On a Saturday in approximately September 2025, Miller publicly mocked Plaintiff's frequent restroom needs and physical movements in front of personnel from the help desk, signal department, and mechanical department.

67. On multiple occasions thereafter, both before and after October 7, 2025, Defendant employees continued to refer to Plaintiff as "the pee pee boy."

68. Plaintiff did not welcome or solicit this treatment.

69. The repeated public ridicule caused Plaintiff to fear requesting medically necessary restroom breaks.

70. Consequently, Plaintiff held his urine longer than his condition permitted, increasing his discomfort and aggravating his symptoms.

**e. An Assistant Director Physically Blocked Plaintiff's Restroom Access**

71. On September 24, 2025, Plaintiff met with Johnson and Lucas concerning his chronic prostate condition and accommodation needs.

72. Plaintiff again informed both supervisors of his condition and the medical documentation previously supplied.

73. Johnson and Lucas discussed using Family and Medical Leave Act procedures, but Defendant did not implement an effective arrangement ensuring timely restroom access while Plaintiff was working.

74. On September 26, 2025, Plaintiff sought treatment at Vybe Urgent Care for a prostate infection and aggravation of his underlying condition.

75. Plaintiff alleges that the repeated delays in restroom access aggravated his condition and contributed to the physical injuries requiring treatment.

76. On October 8, 2026, at approximately 5:50 a.m., Plaintiff urgently needed to use a restroom because of his condition. Incoming relief personnel were already present in the control center, and Lucas and two train dispatchers were standing near the Subway/Elevated control console.

77. When Plaintiff attempted to proceed to a restroom, Lucas stepped into his path and physically blocked him.

78. Lucas moved his face close to Plaintiff's face and stated in a menacing tone, "What you say, get started on that report."

79. Lucas required Plaintiff to remain and work on the report instead of proceeding to the restroom.

80. Plaintiff was forced to delay urination for approximately another thirty minutes.

81 During the delay, Plaintiff experienced substantial discomfort and lost bladder control, wetting his dress pants before he could reach a restroom.

**f. Defendant Failed to Correct the Reported Mistreatment**

82. On September 25, 2025, Plaintiff reported the September 24 incident directly to Johnson.

83. Plaintiff described Lucas's physical confrontation, intimidation, and denial of medically necessary restroom access.

84. Plaintiff expressly told Johnson that the department was a "hostile work environment" staffed with "bullies."

85. Defendant thereby received actual notice of supervisory mistreatment involving Plaintiff's documented medical condition and accommodation needs.

86. Despite that notice, Defendant failed to take prompt and effective corrective action or implement an effective restroom-access accommodation.

87. Throughout the Term of Employment, Defendant also changed Plaintiff's schedule frequently, sometimes two or three times within a week.

88. The changes disrupted Plaintiff's rest and aggravated the physical strain associated with his condition.

89. In September 2025, Johnson interfered and/or assisted in efforts that prevented Plaintiff from transferring out of his department.

90. In September 2025, Taylor then prepared an evaluation that Plaintiff disputed. Plaintiff signed his evaluation under protest, writing, "I do not agree with this assessment and with not being able to identify trains."

91. In approximately October 2025, Plaintiff complained to Johnson about the repeated schedule changes.

92 Johnson stated that he would address the matter, but the disruptions continued.

**g. Plaintiff's Constructive Discharge and Resulting Harm**

93. On October 21, 2025, a physician restricted Plaintiff from entering the workplace from October 21 through October 25, 2025.

94. Plaintiff promptly supplied the restriction to Defendant's supervisors.

95. Plaintiff nevertheless worked a shift on October 25, 2025.

96. During that shift, Taylor trained Plaintiff and Emptage on Broad Street Line operations. Taylor repeatedly yelled and engaged in conduct that Plaintiff experienced as confusing and disruptive to safety-sensitive duties.

97. By that time, Plaintiff had endured repeated interference with medically necessary restroom access, public disability-related ridicule, urinary incontinence at work, supervisory intimidation, and the absence of effective corrective action.

98. The continuing mistreatment and lack of effective accommodation left Plaintiff reasonably concerned that remaining employed would expose him to further medical harm and humiliation.

99. Those conditions became so intolerable that a reasonable person in Plaintiff's circumstances would have felt compelled to resign.

100. Plaintiff resigned at the conclusion of his October 26, 2025 shift because of those conditions.

101. Defendant's conduct caused Plaintiff physical injury, lost compensation and benefits, medical expenses, humiliation, anxiety, emotional distress, and other losses.

**COUNT I: CAHACCI v. SEPTA**
**<u>The Rehabilitation Act - Hostile Work Environment</u>**

102. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

103. Plaintiff was an otherwise qualified individual with a disability, and Defendant was a recipient of federal financial assistance subject to Section 504.

104. Plaintiff was subjected to unwelcome disability-based harassment involving his urinary symptoms, associated physical limitations, and medically necessary restroom access.

105. Plaintiff's disability was the sole reason for the disability-targeted harassment challenged in this count.

106. The harassment was sufficiently severe or pervasive to alter Plaintiff's working conditions, detrimentally affected Plaintiff, and would have detrimentally affected a reasonable person with his disability in like circumstances.

107. Defendant is responsible for supervisory harassment to the extent provided by law and knew or should have known of coworker harassment but failed to take prompt and effective corrective action.

108. Defendant knowingly failed to provide effective relief after receiving Plaintiff's report of supervisory intimidation and denial of medically necessary restroom access.

109. The continuing disability-based hostile environment culminated in Plaintiff's constructive discharge.

110. As a direct and proximate result of Defendant's violation of the Rehabilitation Act, Plaintiff suffered the damages and losses set forth herein and has incurred attorney's fees and costs.

111. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory acts unless and until this Court grants the relief requested herein.

112. No previous application has been made for the relief requested herein.

**COUNT II: CAHACCI v. SEPTA**
**The Rehabilitation Act - Failure to Accomodate**

113. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

114. Plaintiff was an otherwise qualified individual with a disability who could perform his essential job functions with reasonable accommodation.

115. Defendant received federal financial assistance and was subject to Section 504.

116. Defendant knew of Plaintiff's disability and his requests for timely restroom access.

117. Defendant failed to provide an effective reasonable accommodation, repeatedly denied or delayed medically necessary restroom access, and failed to engage in a good-faith interactive process sufficient to identify and implement an effective accommodation.

118. Defendant's knowing failure to accommodate denied Plaintiff equal employment opportunity because of his disability, aggravated his condition, and contributed to his constructive discharge.

119. Plaintiff is now suffering and will continue to suffer irreparable injury and monetary damages as a result of Defendants' discriminatory acts unless and until this Court grants the relief requested herein.

120. No previous application has been made for the relief requested herein.

**COUNT III: CAHACCI v. SEPTA**
**The ADA - Hostile Work Environment**

121. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

122. Plaintiff was a qualified individual with a disability, and Defendant was a covered employer under the ADA.

123. Plaintiff was subjected to unwelcome harassment because of his disability, disability-related symptoms, and associated physical limitations.

124. The harassment was sufficiently severe or pervasive to alter Plaintiff's working conditions, detrimentally affected Plaintiff, and would have detrimentally affected a reasonable person with his disability in like circumstances.

125. Defendant is responsible for supervisory harassment to the extent provided by law and knew or should have known of coworker harassment but failed to take prompt and effective corrective action.

126. The continuing disability-based hostile environment culminated in Plaintiff's constructive discharge.

127. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff suffered economic loss, emotional distress, humiliation, and other compensable injuries and incurred attorneys' fees and costs.

**COUNT IV: CAHACCI v. SEPTA**
**<u>The ADA - Failure to Accomodate</u>**

128. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

129. Plaintiff was a qualified individual with a disability who could perform his essential job functions with reasonable accommodation.

130. Defendant knew of Plaintiff's disability and the resulting need for timely restroom access. Plaintiff requested reasonable accommodation through medical documentation, discussions with supervisors, and requests for medically necessary restroom breaks.

131. Defendant failed to provide an effective reasonable accommodation and failed to engage in a good-faith interactive process sufficient to identify and implement one.

132. Defendant's failure to accommodate aggravated Plaintiff's medical condition and contributed to the intolerable conditions causing his constructive discharge.

133. As a direct and proximate result of Defendant's violation of the ADA, Plaintiff suffered economic loss, emotional distress, humiliation, and other compensable injuries and incurred attorneys' fees and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

a. Enter judgment in Plaintiff's favor and against Defendant on the claims proven;

b. Award equitable relief directing Defendant to reinstate Plaintiff with reasonable accommodation to the position he would have occupied but for Defendant's unlawful conduct, if feasible and appropriate, or award front pay in lieu of reinstatement;

c. Require Defendant to make Plaintiff whole for earnings and employment benefits lost because of Defendant's unlawful conduct, including wages, overtime, and other lost compensation and benefits;

d. Award recoverable medical expenses and other proven pecuniary losses caused by Defendant's unlawful conduct;

e. Award compensatory damages under the ADA for emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other compensable nonpecuniary losses, subject to applicable statutory limitations;

f. Award economic and equitable relief authorized under the Rehabilitation Act, without awarding emotional-distress damages under that statute;

g. Award reasonable attorneys' fees, litigation expenses, and costs under 29 U.S.C. § 794a(b) and 42 U.S.C. § 12205, as applicable;

h. Award prejudgment and postjudgment interest as permitted by law; and

i. Award such other relief as this Court deems necessary and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

**LAW OFFICE OF STEVEN T. AUERBACH**

By: */s/ Steven Auerbach*_______________
Steven Auerbach, Esquire, LL.M.
Ruslan Aminov, Esquire
201 Meeting House Lane
Merion Station, PA 19066
(215) 964-4410
Auerbach.Steven@gmail.com

*Attorneys for Plaintiff*

Dated: November 9, 2026